The Honorable, the United States Court of Appeals for the First Circuit is now in session. All persons having any business before this Honorable Court may draw near, give their attendance, and they shall be heard. God save the United States of America and this Honorable Court. Thank you. Be seated. Court is in session. Today's cases will be called as previously announced. The times will be as allotted to counsel. The first case today is No. 21-1832, United States v. Shirin Qin. At this time, would Attorney Schneider please come up to the podium and introduce himself on the record to begin? Yes, good morning, Your Honors. Michael Schneider for Shirin Qin. May it please the Court, I would request, Your Honor, two minutes for rebuttal. You may. Thank you. The government's seizure and detention of Mr. Qin's electronic devices for 71 days, actively searching it for 60 days, so exceeded the scope and duration of a border search that it was not a border search at all. But if it was a border search, it was a non-routine search, and it was not reasonable. The length of this detention, 71 days, tripled in length the longest such search approved by this Court, which was the case of Melina Gomez. That was 22 days. In that case, while the Court did acknowledge that there were no hard and fast time limits set by the Supreme Court for border searches, that 22-day search was lengthy. If that was lengthy, this was over the top. The 60-day active search, the 71-day detention, which would apply with respect to all business travelers in principle, was three times what the prosecutor particularly instructed the HSI and CBP agents to limit their search to. It was three times the presumptive length of an appropriate search under HSI policy. Granted, the HSI policy did allow for 15-day extensions, but the presumptive extent of that was 30 days. The CBP policy, which provides for only a five-day seizure and detention and search, is, in terms of its policy, limited to a brief, reasonable period of time. So the search here was extremely intrusive. It went into Mr. Chin's laptop. Just so I understand how the theory works, there's some point in time you imagine we identify as too long, at which point then what warrant and a probable cause is needed to continue the search? At some point, a warrant and probable cause is needed, yes, to continue the search. There's no question that the agents from the beginning had some generic concerns. They were doing their job as border agents. But I guess I'm just trying to, the theory would be something like you can have a limited period of time under reasonable suspicion because it's just a border search. But if you haven't uncovered anything there that then you could use to support showing a probable cause and a warrant unless you have some other basis for it. That's the end. That's the idea. That's correct. I mean, I guess the question is could the agents have detained the devices for 100 days, 200, 300, for several years before obtaining probable cause and a warrant? Well, suppose just hypothetically that because much of the language was in Mandarin, because much of the information was encrypted, and because there was a large volume of it, suppose that it would reasonably take the border patrol people 60 days to search it. Then, and I know you disagree that 60 days was reasonable, but if we were to find that that was a reasonable period of time given those three constraints, then what would your position be? I would say I could imagine other cases where it might have been reasonable for the agents to detain a device for certainly a period exceeding the Molina period, the 22-day period. I don't know where the line drawing should take place, and I'm not sure this is the case for that. But in this case, the real concerns about the so-called practical challenges, and the agents did have some practical challenges. A lot of the files were in Chinese. There's no question about it. A relatively small number of the 55 gigabytes on Mr. Chin's hard drive were subject to some form of encryption, not the kind of encryption the government agents initially expected, not the blockchain or the PGP. There was one other form that they were originally concerned about. But a lot of us have encrypted files. It's not an indication of anything improper to have some encrypted files on one's laptop. I do. What's the point of that, though? Because the idea is if they have your argument for this purpose on length assumes there's reasonable suspicion, right? Reasonable suspicion under what circumstances? Given your focus on the length issue, we're assuming that there's reasonable suspicion of the crime independent of the encryption. So the encryption is relevant not as to whether it creates suspicion. That's true. The encryption is relevant as to whether it creates a practical constraint that requires the length to be as long as it was. So what's the answer to that? If it is encrypted, it is in a foreign language. Yes. What are we supposed to do about the findings of the practical challenges? In this case, Judge Casper did specifically find that the encryption concern was not the agent's primary concern. The primary concern was the number of files that were in Chinese, in Mandarin. The problem here, and one of the things that made the scope and length and duration of this unreasonable, was that when you look at the way the agents did take some time to obtain a Chinese-speaking, Mandarin-speaking agent from New York, but she was ultimately only made present in Boston for 10 days out of the 60-day period. I understand that there were concerns about the Christmas holiday and the New Year's break and that she had children and family obligations, but in a situation like this, I would suggest that the agents are required to operate with more dispatch. I think the way that the agents handled this situation, having Agent McKenna come from, I think it was December 18th through the 21st or 23rd or something like that, having her then return only in mid-January for three days, they were not acting with the kind of diligence and urgency that I think this kind of deprivation requires. Is this case law either directly or by analogy that would give us some insight into what level of review or scrutiny we're supposed to give to the assessment of whether there were practical challenges that made it necessary to take us on? In other words, it's one thing if you have a hard time stop, so it can never be more than 50 days. That's not what you're saying to us. So what you're saying to us is we should scrutinize the practical reasons given for it taking this long to assess whether that was reasonable. What kind of intensity am I supposed to use in reviewing the reasons given for the practical things? It was Christmas, it is in a foreign language, et cetera. How am I supposed to do that? I don't have a particular case to provide your honors. Whatever I have would be in my brief. But I would say that there's an understanding. Border searches historically have been literally border searches and they have been brief. Over time, the courts throughout the country, the Ninth Circuit in some ways because of its borders may have been in the lead of this, have recognized that border searches can take place some distance from the border. And so there's no question here that taking the stuff to downtown Boston was a problem. But in terms of the length, I think the issue is were the agents acting with sufficient diligence? Was the fact that they kind of waited so long and then had the agent available, the Chinese-speaking agent available for such a short period of time, is something this court should take into account when looking at the length and duration and scope of this. These were extremely private documents in addition to business documents that were in this thing. And the extent of the search was deep. I want to make sure you have a chance to talk about whether there was a basis for reasonable suspicion as well, unless either of my colleagues wants to spend additional time on the length issue. So the reasonable suspicion issue is a long one and that's why it takes such a lengthy treatment in my brief. Can I just, Trane, your focus on two questions that I have and you tell them. As I read the district court opinion, and it's not entirely credible, but I think the district court says that there was reasonable suspicion of export violations. And then she has a trailing clause including blah, blah, blah, and lists four or five different things, which I assume are things that support the basis for reasonable suspicion of export violations. And the two that I'd like you to address are what she identifies as a false statement or reason to believe that there was a false statement about the buoys. And then the reason to believe that your client had caused the mislabeling of the EEI, not disclosing the end user. And the reason that those two stand out to me is if the agents believe that there was concealing of information about what was being acquired and to whom it was going to. That seems to me it could provide a reasonable basis to think, given the other information, that this person had engaged or was engaging in smuggling and wasn't just about to be doing it. So what's your answer to that? Maybe I should work backwards with respect to the listing of Link Ocean as the ultimate consignee, although that's a complicated or maybe not so complicated issue. When you actually read the Federal Trade Regulations, I think it was pretty clear that Link Ocean was a reseller and a distributor, which is one of the four types of ultimate consignees that was in the regulations. Link Ocean was not responsible. Mr. Chin was not responsible for filling out the EEI. You're not disputing that Link Ocean had known customers that it was going to deliver things to? It had known customers, but in this case, one of the things that just stands out is the fact that the only two investigations that the agents actually made into the 31 transactions they had listed on the Link Ocean electronic export information documents that they had, the only two investigations showed that Mr. Chin had accurately disclosed the end users on the purchase orders for both of those two transactions involving the marine sonic suppliers. They had an opportunity to continue investigating prior to this to figure out whether Mr. Chin was listing, was causing Mr. Link Ocean to be listed as the ultimate consignee. They had every opportunity to conduct a further investigation, but the only two they conducted showed that he had actually properly disclosed the end users, so there was no concealment here. The federal trade regulations and the term ultimate consignee was way off base. I mean, I litigated the U.S. versus Lockman case. The agents are responsible for following the plain meaning of the regulations, and I think the plain meaning of the regulations showed that Link Ocean was the foreign principal party in interest. It was appropriately an ultimate consignee. Well, can you export sonobuoys to China? You can't export sonobuoys to China, but Mr. Chin, number one. If you can't do it, he told an undercover agent he was interested in doing it. He told someone else not to let someone know that his customer was in China. Why wasn't there probable cause that he was trying to do something that was unlawful? Mr. Chin did in the initial, first of all, he made one request about the sonobuoys. Number two, he did ask the agents who were involved in the negotiations whether an export license would be needed, and the critical email of August 14, 2017 shows that he specifically said my client only wanted one. He rejected the agent's effort to upsell him on that, and he basically said, I'm not going to do this because an export license is required. So he kind of really dealt with that. With respect to the statements, first of all, by 18 days prior to the stop at Logan Airport, the secondary inspection at Logan Airport, Agent Anderson, who was one of the two lead co-case agents on the case, this is just the argument in your brief about what the evidence shows, right? This is an argument that the statement wasn't false. Is that the basic idea? That there was disagreement about what the agents actually testified, what the statement was. Agent Anderson said that Hughes came back into the office, the HSI office, and said, these are the types of things that I exported. The judge's finding also, if you really want to laser in on that, was that the agents felt that Chin could understand what they were saying, but the judge made no finding as to whether Chin was fully capable of conversing and articulating his understanding of what he was doing in English. And in fact, the June 30th report of the undercover case agent, you know, showed that Mr. Chin was in fact not very fluent in Chinese. So when you look closely at the judge's findings, they don't necessarily indicate that Mr. Chin understood fully what it was he was saying, and it's not clear that the diagrams shouldn't have disabused the agents of what their understanding was. When you look at the discussion of what occurred in the HSI office, the focus was on Chin's inquiries, not purchases, because he didn't do it, into AUVs and sonobuoys and robotic boats. Thank you. At this time, if Attorney Eisenstadt would introduce herself on the record to begin. Good morning. May it please the Court, Karen Eisenstadt for the government. I'd just like to quickly pick up where counsel left off on the question of reasonable suspicion. I have three points here. Mr. Chin caused a U.S. manufacturer to conceal from the United States government the actual customer for his exports. That is causing the filing of false electronic export information, EEI. And it's a known way to evade U.S. export controls that was established by this Court's opinion in lieu. I just want to make sure I understand what your argument is, what the District Court's finding is, and what we're supposed to then assess. Is the finding that they had reason to believe he had caused it, and therefore there was reasonable suspicion of an export violation in light of that reasonable belief on their part, combined with the other things, or is it that that's the violation that gives rise to the basis for the search? I think it's the latter, Your Honor. Because I don't read the District Court to have said that. As I understand the District Court's statement, it said that there's reasonable suspicion of export violations, which is sort of a broad umbrella, violations related to exports. Well, I don't know if that's what the District Court's saying, or what the District Court's saying is that there's a reasonable suspicion of export violations, not things that are related to them, because it says export violations, and then it says including, and as I read it, that including phrase seems to me a list of things about which there is reason to think Glenn did these things such that one could reasonably then suspect he was engaged in export violations. You seem to be reading the District Court to have found that each of those things in the including clause is itself a, quote, export violation, but visa fraud? That seems like an odd way to characterize it. I think the way the District Court, so she uses the word at least, so the government was sort of picking up on the at least, when she says causing the filing of false EI, which is itself a federal crime, visa fraud, a federal crime, and false statements of federal crime, so I think the court was looking at it in a broader sense, but also said to the extent there's any dispute about export violations in terms of license violations, et cetera, at the very least there was reasonable suspicion of these specific federal crimes, which would then themselves independently establish reasonable suspicion for the search. So I think she was sort of finding both, but also saying to the extent the court disagrees as to the broader category. Are you saying the District Court was finding there was reasonable suspicion of export violations in the classic sense, or not? I mean, I don't, I didn't read the court's decision as necessarily finding that. That's not what I asked. Do you read it to have found it at all, yes or no? Let me take a quick look again. It's just hard to evaluate what there's reasonable suspicion of if I can't pin down what is the crime they suspected was committed. So the District Court said, agents had reasonable suspicion that the electronic devices, which Chin identified as the devices used for work, would contain evidence of export violations, including but not limited to. So I understand the District Court to be listing those as export violations, sort of in the sense of Al-Asad, that these are border-related crimes that fall within that jurisdiction. So the things that are listed there are the crimes, not necessarily smuggling itself or the actual export. That is my understanding of what the court was saying here, by saying including but not limited to. By identifying specific provisions of federal law that are crimes, those are the crimes specifically, concretely, that there would be reasonable suspicion to suspect had occurred. Okay, so we need to then, on your view, assess whether there's reasonable suspicion of each of those listed things in the including clause. Or at least one of them. Yes, at least as to one of them. Yes, that's my understanding. Okay, so you say that at the beginning there's reasonable suspicion of causing the filing of the false EEI. Correct. And just the other two points I was going to make. Mr. Chin also was trying to get people to sell him export-controlled products. He was making inquiries about... Can I just ask, is it clear that all of those things listed in the including clause are enforced by CBP? Yes, that's my understanding. Or ICE, which is... Visa fraud? Well, CBP in terms of admissibility, I think, in the country. So the government didn't rely independently on visa fraud because the visa fraud presupposes export violations. It would be fraud in terms of checking I didn't commit any other crimes. So that really doesn't stand independently as a basis as the government reads it. Okay. And each of the other listed things is within our precedent a CBP-enforced offense? Right, that's correct. It's sort of within the al-Assad world of trans-border crime that's investigated and enforced by these agencies, CBP and ICE, that at the time were the two agencies that have border authority. I think since then it's been amended, but at the time. And in addition was seeking to purchase military-use-only sauna buoys. Ann had also hinted more than once to Riptide and then to the agent about his openness to taking steps to bypass U.S. export controls. So showing a familiarity with export controls and a willingness to sidestep them. I hate to just keep harping on this, but I just want to understand there's filing of false EEI. Correct. So the evidence of that is what? That would be from the EEI itself and then with the interview with the manufacturer Marine Sonic where they explain that they filed the EEI listing for Link Ocean as the ultimate consignee because Mr. Chin had made that request to them, don't list the actual customer, list Link Ocean. So that's the causing aspect of it. And at the time that the officers then engaged in the search, they had reason to think that Chin knew that there was an end user that was not being listed? Correct, because Marine Sonic told them that at the interview, yes. Okay. And then Visa fraud, you're saying you're not relying on as the crime? I think it doesn't stand independently. So then the only other one listed is the false statement? Correct. So what do you have to say about the false statement? Okay. So the facts are that at his customs interview, he's asked a seemingly innocuous question about what types of products he exports and he lies. And Mr. Chin has argued on appeal that it's not clear that he lied or it's not clear that there was any express statement of limitation in what he told the customs officers, but that's not belied by the record. So if you look at the district court's finding, she specifically found that Mr. Chin indicated that he exported commodities to China, including instruments for measuring current, water depth, and water temperature, all of which attach to marine buoys. When asked about his other exports, so a clarifying second question, Chin indicated that he only exported items attached to buoys. And when you look at the testimony of the agents, it's all in accord with that. There isn't any discrepancy. Just so we're clear, that word only, is that her word or is that taken from a statement by anybody else? So Officer Hughes was one of the customs agents who was actually conducting the interview. He testified at the hearing. After hearing that the types of things were things that attach to buoys, he says, well, we asked him specifically that question, if he exported any items other than those, and he said, no, just items that attach to the buoys. That's in the joint appendix at page 1022. Then Agent Belmarsh, who is the other CBP agent in the interview, we have his report, and in that report it states, Chin stated he exports only certain instruments that attach to a buoy. And that's on page 2065 of the joint appendix. Can I just ask then how this point relates to the length? In the following sense, if we isolate the crime to the false statement, didn't they know the statement was false before they even looked at the computer? I think they had information indicating the statement was false. So why would you need 60 days to then search the computer to prove the false statement when you already had the information about it? If the violation was an export violation, in other words, they're worried that he's been smuggling or is in the process of smuggling, it seems to me to make a lot more sense that they need to do this intensive 60-day search. But if your point is that the violation was the false statement, it seems harder to see why it's reasonable to hold the computer for 60 days to prove that. Right. And so I think here the concern is causing the filing of false EI as well. So they have information that that appears to have occurred with Marine Sonic. That's only one of the manufacturers from whom he's been exporting over the years. They know he's been working with a lot of other manufacturers, none of which show a reporting of ultimate consignee other than Link Ocean. So there's a concern that this has been ongoing and it's a practice. And as this court indicated in the Wu decision, it is a way to evade export controls. It's unknown if, you know, at the time that they had a reasonable suspicion that this is being used to hide end users that perhaps should not be receiving the products, et cetera. And so that's what the purpose of the search is, to pursue the reasonable suspicion that that's occurring and find out, you know, what's behind it. Because it's an act of concealment, but they don't know is it because he's smuggling or is it for some other reason. But they do have reasonable suspicion that the crime has occurred and is continuing to occur as the business is ongoing. If you look for a moment at the durational issue, do we take as a given the resources that the agencies have made available to their tasks and their anticipated tasks, and then say was it reasonable given those resources? Or do we ask at the outset, given that they're going to have to make these searches from time to time, have they allocated reasonable resources to it? The reason I ask is it seems common knowledge that at least some portions of the government have particular concern about exports to China. It would therefore seem rather odd that apparently searching the entire United States, it took them so long to find even the single person in any of the agencies who spoke Mandarin. So to answer Your Honor's first question, I think Molina Gomez teaches, you know, in addition to there not being a hard and fast time limit, that, you know, agency resource constraints are a relevant factor. So there the court held we declined to second guess the techniques used by the lab and require a faster alternative because that could have damaged the electronics, put an unnecessary budgetary and workload strain on the lab, or could have failed, you know, to detect the heroin that was hidden. And there the court approved a 22-day detention for a search that was fairly rudimentary, and I think orders of magnitude more simple than the search here. It was, you know, drugs that were hidden in a computer, so you just have to sort of unscrew the casing, open the computer and find the drugs. And on a cursory look at the record, it doesn't appear the agents there even tried to open that computer for 18 days. It just sat on a shelf, but there's, you know, concerns that there may be, you know, only specialized agents who can do that or that there's, you know, workload strain. So I think the case law does support the idea that, you know, the fact it is a common sense and realistic way to look at reasonableness to take into account that there are resource constraints that the government operates under. And then when you look at what happened here, I think the practical challenges stand out because, you know, one, the level of language sophistication they needed was actually fairly high and consequently harder to get. So it's not just someone who can speak Chinese, but it needs to be someone who can read and translate it, and not just regular conversation terms, but marine and export terms that are highly technical. So that's a level of sophistication both in Chinese and in English that they needed for this agent to have, for it to be useful. And there's testimony that they tried language translation software, and it was completely useless for what they're trying to do here. Furthermore, you know, Qin crossed the border. As a matter of fact, he crossed the border. The detention here happens the day after Thanksgiving, Friday. And there's no evidence of any dilatory behavior by the agents. They immediately go to the HSI office that Friday after Thanksgiving, and they start imaging the computer. And it's the next Monday, right after the weekend, that they start the search for the agent who has the skills and availability to come to Boston who can help with the search. So there's no delay in terms of trying to get the resources. It's just a practical constraint. I think those facts cut the other way, to ask Judge Kayada's question again, or at least a portion of it. If they already had concerns, reason to believe about what they would be dealing with, a little foresight might have prevented some of these delays. I think in terms of, you know, really pulling the trigger on trying to get, you know, agency funding and resources for this, that happened once they started imaging the computer and looked at it. So it wasn't an assumption made that they would. But you can back into this. If 22 days, for example, is a benchmark that has been set in one case or another, investigative agencies can prepare for that. We've got to get translators lined up. So what do you say about that? I mean, it's understood that, of course, I think that when you read Melina Gomez, sort of the view of the court is it's not this court's job to micromanage, sort of, or scrutinize sort of every step the government takes in these investigatory, investigation situations. So, I mean, this is the Fourth Amendment, and it needs to be reasonable. And that, of course, may I finish? Yes. That, of course, is what the court is looking at. But in terms of each individual step and whether the government should have lined up someone sooner, I do think that's, you know, second-guessing each step the government takes, I think, is sort of just a rabbit hole that's not necessary to get into in terms of enforcing the Fourth Amendment rights at issue. But I guess the thought is that it's only necessary when you're past some benchmark threshold. It's not that every time there's a search should have been six days rather than seven days. But if we've got a case saying 22 days is lengthy, and now we have a case with 60 plus 11, so 71, maybe we should start scrutinizing the days past 22. Well, I think based on Molina-Gomez and the type of search at issue there, you know, that was lengthy for what they were doing and the challenges at issue in that it was just drugs inside a computer. I think what we're dealing here is just different in kind for that reason. Before you go, I just want to make sure I understand your argument. If I didn't read the district court as you read it, where that including clause is just a listing of the export violations, if I read the district court instead to be saying that there was reasonable suspicion that the devices would contain evidence of export violations, actual exporting, things that you shouldn't export, and that the things in the including clause are just lists of things that would provide a basis for the reasonable suspicion of the export violations, are you making that argument or are you not? The government, I think, is making that argument. I don't think they're trying to restrict the argument in terms of what there's reasonable suspicion of. It's sort of setting the baseline. So just help me. You heard your opponent's argument with respect to the two things I identified, the basis for thinking that it wasn't causing him to not list something on the EEI, and the false statement about the buoys. What's the government's view as to whether those two pieces of belief that the officers, if they reasonably could have had them, would that support the conclusion that he was engaged in an export violation or had committed export violations in light of the other pieces of evidence in the record? Yes. I think it absolutely would because, you know, the false statement, of course, is a statement of concealment, so it raises the suspicion, and also all the other things he had been trying to obtain, which are export controlled, and thus if, you know, someone had actually sold him those and we know there's been no license obtained, that would be an export violation. Okay. Thank you. Thank you. At this time, if Attorney Schneider would reintroduce himself on the record to begin. Michael Schneider again for Sharon Chin. Your Honor, so with respect to the last question that you asked the Assistant District Attorney, there were no export violations that the agents had a reasonable basis for believing had actually occurred. Again, the two cases with respect to listing Link Ocean as the ultimate consignee, the two cases that they investigated, they found that he had properly disclosed the end user information to the government. The agents to the U.S. principal party in interest were insonic. So to the extent that the judge found that the agents had reasonable suspicion of export violations. Can you just clarify for me how you read this key sentence in the district court's opinion? Is the district court saying that the things listed in that including clause are the crimes about which they had reasonable suspicion that support the search? Or is the district court saying the crimes are export violations and the things in the including clause are things they had beliefs about that provided reasonable suspicion of the export violations? I think it is the latter. I think that the judge was intending to say that they had evident they had reasonable suspicion to believe that there were export violations and that they included these other things. What's they? The violations? No, that the agents believed that these things went to the issue of whether there were export violations. And in your view, in order for there to be reasonable suspicion of an export violation, it has to be one that is being committed or has been committed, not one that might be committed, correct? Correct. And I would point out, though, that when the agents were asked what they were looking for in their keyword searches, they specifically said that they were looking for evidence of possible future export violations. The other thing is if they Which you say just categorically can't be a basis for reasonable suspicion? Can't be a basis for a search even if there's reasonable suspicion that a future crime might occur? I would submit under the facts of this case, I don't know about categorically, I'm not sure that I would want to venture into your Honor's territory of determining whether it's categorical, but I would say certainly under the facts of this case, the fact that the agents were looking for the possibility of future export violations indicated that they did not actually have reasonable suspicion, a sufficiently articulable, particularized basis for believing that criminal activity was afoot. Well, if they had activity, there hadn't been an export violation, but he was in the process of accomplishing one. Are you saying they couldn't search? If they felt that he was genuinely in the process of accomplishing one, that might be a different story. He was planning. He was in the early stages of trying to do it. But in this case, he had made I'm not asking about this case. I'm just asking what your position is in response to Judge Barron's question. If someone in Mr. Chin's position is simply making inquiries about goods that may require an export It is the idea that there'd have to be reasonable suspicion that he'd taken steps that would qualify as attempt or conspiracy or something like that. It's got to be an actual crime, not just reasonable suspicion that I think he may commit a crime. Yes, and it's pretty clear that from the minute that the inception of this entire investigation But you don't know if Is there case law that you know of that draws that line? That in order for a border search to occur, it's got to be of an ongoing or prior crime and not reasonable suspicion of a crime that is imminent or about to occur? Well, I believe the District Court of Columbia, the Kim case, talks about the fact that there needs to be evidence of an ongoing crime. And in that case, the court specifically, Judge Amy Berman Jackson specifically said evidence of past crimes that had previously occurred and that were done and finished that alone would not be enough. If the agents have a basis for believing that a crime occurred, they have probable cause and they should get a warrant. So now I'm confused. If you're saying past crimes are no good, but planned crimes are no good, what is good? Evidence that under the Terry standard, criminal activity is a crime. You've got to be right in the middle of it as you cross the border. Evidence of ongoing imminent crime, criminal activity. But that's not consistent with our recent press in Alamod, right? Because that opinion seems to contemplate past crimes, past border crimes. Counting, or do you not read it that way? Alistad? Yeah. I think if there was evidence of recent border crimes that looked as though First of all, why wouldn't an agent go ahead and get a warrant if they had a probable cause to believe that a past crime occurred? And I think the Constitution expects that our government behave like this. I mean, this could be an important teaching moment for U.S.-Chinese relations to show how we do things in this country. We have a Constitution. If there's evidence of a past crime, then agents of our government should go out and get a warrant if they have probable cause. In this case, I think it's pretty clear that the agents were using this stop in detention, which was preplanned as of November 6th. But why would an – but the logic just sort of breaks down. The same is true of an ongoing crime. With respect – I'm not sure I understand. With an ongoing crime, why don't you get a warrant? But what's the – is the theory that you just wouldn't have time to get it, at that moment? If they have reasonable suspicion that a defendant is engaging in ongoing criminal activity, then they have the right to conduct a border search under ALICAD. But even if the crime isn't actually at the border, that's what's odd about that. Yeah. Okay, thank you. Any further questions? Thank you. Thank you. That concludes argument in this case.